# IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLORADO
## Judge Daniel D. Domenico

Case No. 1:17-cv-02444-DDD-NRN

REID POLLACK,

    Plaintiff,

v.

POLLY MILLER,

    Defendant.

## ORDER GRANTING SUMMARY JUDGMENT

Plaintiff Reid Pollack was arrested on domestic violence charges following reports that he had choked his girlfriend, but the criminal case against him was ultimately dropped. Mr. Pollack, proceeding pro se, brings claims against Detective Polly Miller, who investigated the case for the Boulder County Sheriff's Office, for malicious prosecution and judicial deception. Before the Court is Detective Miller's motion for summary judgment on both claims. (*See* Docs. 98, 104, 107.) For the following reasons, the motion is **GRANTED**.

## BACKGROUND

On July 5, 2014, at 10:45 a.m., Karen Rusnik called 911, gave her address, and stated that "Reid [Pollack] is there and I want to get somebody to [inaudible] I can get my stuff out." (Call Audio, Doc. 98-1.) Less than two hours later, Boulder County Sheriff's Office Deputy Keith Powell called Ms. Rusnik back. Ms. Rusnik informed Deputy Powell that she had moved out of her residence, had not taken her belongings, needed to

return to the property, but was afraid to because she didn't want to get into a conflict with her "mean" and "abusive" former partner, Mr. Pollack. (Narrative Report, Doc. 98-2, at 3.)[1] Ms. Rusnik told the deputy that Mr. Pollack had abused her on June 30, 2014. According to Ms. Rusnik, sometime between 12:00 noon and 1:00 p.m., Mr. Pollack had become angry while looking for the keys to her car and, when he passed Ms. Rusnik in the hallway of their home, he put both hands around her neck and pushed down for a few seconds. (*Id.*) Deputy Powell noted, during their conversation, that Ms. Rusnik was difficult to understand at times, which Ms. Rusnik attributed to a stroke she had four years prior. (*Id.*)[2]

Deputy Powell interviewed Mr. Pollack. Mr. Pollack's version of what happened on June 30 was different. He said that, from 11:00 a.m. to just after 1:30 p.m., he had been sleeping and was awakened by a call from Ms. Rusnik, who told him that her car was stuck in the middle of the road. Mr. Pollack stated that he eventually had to go to move the car, and he denied any physical altercation. (*Id.*)

---

[1] Mr. Pollack disputes that Deputy Powell was talking to Ms. Rusnik at all times during this phone interview and believes someone else was speaking for her. But here, as with other arguments he makes to in opposition to Detective Miller's evidence, he offers no evidence to the contrary. "[M]ere speculation unsupported by evidence is insufficient to resist summary judgment." *Martinez v. CO2 Servs., Inc.*, 12 F. App'x 689, 695 (10th Cir. 2001) (citing *Peterson v. Shanks*, 149 F.3d 1140, 1144–45 (10th Cir. 1998)).

[2] According to Mr. Pollack, this stroke caused Ms. Rusnik to have a condition called aphasia, which is an impairment of language, affecting the production or comprehension of speech and the ability to read or write.

Deputies Powell and Simpson then met with Ms. Rusnik in person. Deputy Powell observed no injuries on her neck or swelling or hoarseness of voice. But Ms. Rusnik stated that a Josh Moore had taken pictures of her neck back on June 30, and she gave the deputies Mr. Moore's phone number. (*Id.* at 4.) Deputy Powell then called Mr. Moore, who did not cooperate at that time.[3] Deputy Powell returned to see Ms. Rusnik, who described to him how Mr. Pollack had put his hands on her neck and caused pressure at a level "7" on a scale of 1 to 10. (*Id.*; *see also* Domestic Violence and Strangulation Investigation Forms, Doc. 98-3.) She also noted a small bruise on her chin, which she wasn't sure was from the altercation. (Doc. 98-2, at 4.)

Four days later, on July 9, 2014, Detective Miller followed up on the case. She reviewed the facts above, as stated in Deputy Powell's report. Deputy Powell had "determined that there [were] some statements that did not add up" and that he "did not believe that there was enough evidence of consistency with the information he had gather[ed] to arrest [Mr.] Pollack." (*Id.* at 5.) After having trouble reaching Ms. Rusnik, on July 25, Detective Miller drove to the home at which Ms. Rusnik had been staying, which belonged to Billie Riley. Neither Ms. Rusnik nor Ms. Riley was home, but Detective Miller was able to reach Ms. Riley by phone. (*Id.* at 6.)

---

[3] On October 17, 2014, the day before the district attorney dropped the case against Mr. Pollack, Mr. Moore supplied a photo to Deputy Powell by e-mail, along with a short narrative which, among other things, stated that "Reid [Pollack] struck Karen [Rusnik] across the nexk & he pushed her." (E-mail, Doc. 98-12 (photo redacted).) Mr. Pollack asserts the photo is altered. Because only a redacted photo has been filed in this case, the Court has not considered the contents of the photo, which are immaterial to a determination that Detective Miller had probable cause to arrest Mr. Pollack months prior.

3

Detective Miller recorded the following from her phone conversation with Ms. Riley. Mr. Pollack and Ms. Rusnik "have been dating off and on for over 14 years." Ms. Riley "had known Ms. Rusnik for about 8 or 9 years." About six years prior, when Ms. Rusnik had her first stroke, Ms. Riley "started to notice how bad [Mr. Pollack] was treating [Ms. Rusnik]." On June 30,

> sometime in the early evening, [Ms. Rusnik] had called [Ms. Riley] while [Ms. Riley] was at work. [Ms. Rusnik] said she wanted her to come and pick her up. [Ms. Riley] assumed it was to do their normal hang out and shop sort of thing. She told [Ms. Rusnik] she can't leave until her job is done but she can come after that. This is when she heard [Ms. Rusnik] start crying and sounding very scared on the phone. [Ms. Riley] said this is not like her to cry or show fear so this caught her off guard.
>
> [Ms. Riley] asked [Ms. Rusnik] what was wrong and she told her that [Mr. Pollack] and her got in a fight and [he] tried to choke her.

When Ms. Riley picked Ms. Rusnik up later that evening, she "could see the red marks on [Ms. Rusnik's] neck once she got in the car." Ms. Rusnik told Ms. Riley that she and Mr. Pollack had "argued over the fact his car had broke [sic] down. Ms. Rusnik said he blamed her for it and was extremely angry. He put his hands around her neck and squeezed her really hard." Ms. Riley told Detective Miller "there have been several incidents that happened over the last few years where she was afraid for her friend because of [Mr. Pollack's] treatment of her." Finally, Ms. Riley suspected that Ms. Rusnik had, at the time of the call with Detective Miller, returned to live with Mr. Pollack. (*Id.* at 6–7.)[4]

---

[4] Mr. Pollack disputes the accuracy of everything Ms. Riley told Detective Miller. He speculates that "whether [Ms. Riley] actually said some of these things is unknown" (Doc. 104, at 5), but he does not point to any

4

Based on Deputy Powell's report and her conversation with Ms. Riley, Detective Miller determined there was probable cause to arrest Mr. Pollack for second degree assault "with the urgency factor that the victim, [Ms. Rusnik], was living back at the house with [Mr. Pollack]." (*Id.* at 8.) Sergeant Oehlkers, Detective Miller's supervisor, agreed probable cause existed. (*Id.*) Per Colo. Rev. Stat. § 18-6-803.6(1), when "a peace officer determines that there is probable cause to believe that a crime or offense involving domestic violence . . . has been committed, the officer shall, without undue delay, arrest the person suspected of its commission."

On July 25, 2014, Detective Miller accompanied other officers to arrest Mr. Pollack. Upon arrival at his home, they saw Ms. Rusnik in the front yard. While the other officers took Mr. Pollack into custody and transported him to the Boulder County Jail, Detective Miller says she was able to speak in person to Ms. Rusnik, who again recounted the assault of June 30. (*Id.* at 8–9.)[5] Detective Miller then went to the jail to interview Mr. Pollack, who stated that he never choked Ms. Rusnik. (*Id.* at 9.)

A few days later, Detective Miller filled out an affidavit, including a probable cause narrative, for magistrate review. (*See generally* Doc. 98-

---

evidence showing that Ms. Riley didn't relay this information to Detective Miller or that Detective Miller's report doesn't accurately reflect what she was told.

[5]  Mr. Pollack asserts that this interview with Ms. Rusnik, concurrent with his arrest, was "fabricated" and has filed a March 9, 2020 affidavit by Ms. Rusnik stating that "following [Mr. Pollack's] arrest [she] refused to speak with Detective Miller." (Rusnik Aff., Doc. 104-1.) As explained below, whether the interview took place is immaterial to the outcome of this motion.

5

7.) The narrative recounts the arrest, Ms. Rusnik's difficulties communicating and health condition, the contents of the interview between Ms. Rusnik and Detective Miller on the date of Mr. Pollack's arrest, and Detective Miller's conversation with Ms. Riley. (*Id.* at 6.) Mr. Pollack contends that Detective Miller "fabricated" the second and third paragraphs of this probable cause narrative, which detail information gleaned from Detective Miller's interview with Ms. Rusnik. Magistrate Robert R. Gunning reviewed the affidavit and determined it contained probable cause for the arrest. (*Id.* at 1.)

Mr. Polack remained in custody from July 25–31, 2014, and was prosecuted for over a year before the charges were ultimately dropped.

## DISCUSSION

Mr. Pollack sues Detective Miller for malicious prosecution and judicial deception.[6] Detective Miller moves for summary judgment, which is appropriate if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court must consider any disputed material fact in the light most favorable to Mr. Pollack. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 261 (1986). And when a party proceeds pro se, as Mr. Pollack does here, the Court "review[s] his pleadings and other papers liberally and hold[s] them to a less stringent standard than those drafted by attorneys." *Trackwell v. United States*, 472 F.3d 1242, 1243 (10th Cir. 2007) (citations omitted). But it is not "the proper function of the district

---

[6] The operative Amended Complaint (Doc. 70) states that Mr. Pollack sues Detective Miller "in her personal and official capacity," but there are no allegations in the Amended Complaint or facts in the summary judgment record to support a theory of municipal liability. The Court therefore considers the claims to be against Detective Miller in her individual capacity.

court to assume the role of advocate for the pro se litigant." *Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991). So if "a reasonable trier of fact could not return a verdict" for Mr. Pollack, summary judgment is required. *See White v. York Int'l Corp.*, 45 F.3d 357, 360 (10th Cir. 1995).

### A. Malicious Prosecution

A Section 1983 malicious prosecution claim is made up of the following elements: (1) the defendant caused the plaintiff's continued confinement or prosecution; (2) the original action terminated in favor of the plaintiff; (3) no probable cause supported the original arrest, continued confinement, or prosecution; (4) the defendant acted with malice; and (5) the plaintiff sustained damages. *Wilkins v. DeReyes*, 528 F.3d 790, 799 (10th Cir. 2008). Detective Miller argues that Mr. Pollack has failed to show that his criminal case terminated in his favor, that there was no probable cause to arrest, or that she acted with malice. She also asserts, in the alternative, that she is entitled to qualified immunity. Because the Court agrees she is entitled to qualified immunity it need not address her other arguments.

"When a warrantless arrest is the subject of a [Section] 1983 action, the arresting officer is entitled to qualified immunity if a reasonable officer could have believed that probable cause existed to make the arrest." *Robertson v. Las Animas Cty. Sheriff's Dep't*, 500 F.3d 1185, 1191 (10th Cir. 2007) (citing *Romero v. Fay,* 45 F.3d 1472, 1476 (10th Cir. 1995)). "Probable cause exists if facts and circumstances within the arresting officer's knowledge and of which he or she has reasonably trustworthy information are sufficient to lead a prudent person to believe that the arrestee has committed or is committing an offense." *Id.* (quoting *Robertson*, 500 F.3d at 1191). Law enforcement officials who "'reasonably but mistakenly conclude that probable cause is present' are entitled to

7

immunity." *Id.* (quoting *Robertson*, 500 F.3d at 1191). The burden is on the plaintiff to "make a substantial showing of deliberate falsehood or reckless disregard for truth" by the officer seeking the warrant. *Snell v. Tunnell*, 920 F.2d 673, 698 (10th Cir.1990). "To establish reckless disregard in the presentation of information to a magistrate judge, 'there must exist evidence that the officer in fact entertained serious doubts as to the truth of [her] allegations.'" *Stonecipher v. Valles*, 759 F.3d 1134, 1142 (10th Cir. 2014) (quoting *Beard v. City of Northglenn*, 24 F.3d 110, 116 (10th Cir. 1994)).

A reasonable officer with all the same facts as Detective Miller would have believed there was probable cause to arrest Mr. Pollack. She had reviewed Deputy Powell's report containing the Ms. Rusnik's account and description of the assault and a diagram of injuries. She personally spoke with Billie Riley, from whom the Ms. Rusnik had sought help and lived with immediately following the assault. Ms. Riley related to Detective Miller Pollack's history of abuse, corroborated with the victim's original allegations, and recalled seeing red marks on the victim's neck immediately after the incident. Under these facts, Detective Miller is entitled to qualified immunity.

Mr. Pollack counters by alleging that Detective Miller fabricated portions of her probable cause affidavit, namely the part that recounts Detective Miller's interview with Ms. Rusnik. He supplied a recent affidavit from Ms. Rusnik herself, in which she states that she "refused to speak" with the detective and "did not make any of the statements" that were included in the probable cause narrative. (Doc. 104-1, at 1.) He also highlights Ms. Rusnik's stroke-induced speech difficulties, which he believes caused communication errors between Ms. Rusnik and Deputy Powell. He further suggests that during a portion of Deputy Powell's

8

phone conversation with Ms. Rusnik, Deputy Powell was instead speaking to Ms. Riley. (Doc. 104, at 10–13.) The only evidence Mr. Pollack provides in support of these contentions, however, is the affidavit from Ms. Rusnik. The rest is "mere speculation unsupported by evidence" and is therefore "insufficient to resist summary judgment." *Martinez*, 12 F. App'x at 695. And even if Ms. Rusnik's affidavit were credited as a "substantial showing" that the interview did not take place, it does not change the outcome.

As to the allegedly fabricated interview, Mr. Pollack is correct that officers may not be entitled to qualified immunity on summary judgment for malicious prosecution where there is a factual dispute whether they fabricated evidence and then relied on it in arresting a plaintiff. *See Wilkins*, 528 F.3d at 793. In *Wilkins*, the plaintiffs supplied evidence that officers intentionally extracted matching false statements regarding the alleged crime and then used the statements as the sole basis for the plaintiffs' subsequent arrest and trial. The plaintiffs' opposition to summary judgment suggested that the officers took advantage of witnesses' age and learning disabilities, and threatened the witnesses and their families with harm, to persuade them to implicate plaintiffs. *Id.* at 794. And so, the court concluded that plaintiffs had "presented facts that, if true, constitute a violation of the Fourth Amendment. Without the allegedly fabricated statements, the officers did not present information from which a detached magistrate could conclude probable cause existed to justify continued detention." *Id.* at 805.

*Wilkins* is distinguishable. The fabricated statements there were the singular support for the arrest and prosecution. Here, even if Detective Miller actually fabricated the interview with Ms. Rusnik, the facts and circumstances within the detective's knowledge, and of which she had reasonably trustworthy information from at least two sources *before the*

9

*arrest and before the allegedly fabricated interview did or did not take place*, were sufficient to lead a prudent person to believe that Mr. Pollack had committed the offense. *See Robertson*, 500 F.3d at 1191; *Wilkins*, 528 F.3d at 805 ("Where false statements have been relied on to establish probable cause, the existence of probable cause for § 1983 purposes is determined by setting aside the false information." (internal quotation omitted)). Deputy Powell's report detailed his multiple conversations with Ms. Rusnik. Even though he was unable to corroborate the events of June 30, 2014, Detective Miller was. She spoke to Ms. Riley, who described the history of her relationship with Ms. Rusnik and what had happened on the day in question. There is nothing in Ms. Riley's statements, which were in line with Deputy Powell's report, indicating she was not providing credible information, upon which Detective Miller was entitled to rely. *See United States v. Patane*, 304 F.3d 1013, 1017 (10th Cir. 2002) (When "an average citizen tenders information to the police, the police should be permitted to assume that they are dealing with a credible person in the absence of special circumstances suggesting that such may not be the case."), *rev'd on other grounds*, 542 U.S. 630 (2004). Detective Miller and her supervisor agreed there was probable cause, and they went to Mr. Pollack's house to arrest him. Even if, in fact, Ms. Rusnik refused to provide any more information to the officers—which is unfortunately all too common in domestic violence situations—Detective Miller had more than enough to lead a reasonable officer to believe Mr. Pollack had committed a crime. At the time of the arrest, had no information contradicting Deputy Powell's report or Ms. Riley's statements, or that would have otherwise given her "serious doubts" about probable cause. *See Stonecipher*, 759 F.3d at 1142. Since even without the interview "a reasonable officer could have believed that

10

probable cause existed to make the arrest" Deputy Miller is accordingly entitled to qualified immunity on this claim. *Robertson*, 500 F.3d at1191.

### B. Judicial Deception

Mr. Pollack next claims that Detective Miller, by putting "fabricated" facts in a probable cause affidavit for magistrate review, violated his Fourth Amendment rights through judicial deception. *See* 42 U.S.C. § 1983; *see also Taylor v. Meacham*, 82 F.3d 1556, 1562 (10th Cir. 1996) ("It is a violation of the Fourth Amendment for an arrest warrant affiant to 'knowingly, or with reckless disregard for the truth,' include false statements in the affidavit." (quoting *Franks v. Delaware*, 438 U.S. 154, 155–56 (1978)). To survive summary judgment on this claim, he "must (1) make a substantial showing of [Detective Miller's] deliberate falsehood or reckless disregard for the truth and (2) establish that, but for the dishonesty, the challenged action would not have occurred." *Liston v. Cty. of Riverside*, 120 F.3d 965, 973 (9th Cir. 1997), *as amended* (Oct. 9, 1997); *see also Snell v. Tunnell*, 920 F.2d 673, 698 (10th Cir. 1990) ("Construed liberally, the allegations of judicial deception may state a claim that the deputies deliberately or recklessly incorporated known falsehoods into their reports, criminal complaints and warrant applications."). Here, the challenged action is Detective Miller's reference to her interview with Ms. Rusnik, included with the probable cause affidavit. Detective Miller argues that this claim fails for want of causation and, at any rate, it is time-barred.

As to causation, Mr. Pollack would need to show that, but for Detective Miller's inclusion of the fabricated material, he would not have been imprisoned and prosecuted. Since this is essentially the same requirement he faced in his malicious prosecution claim, it fails for essentially the same reasons. As discussed above, even absent any reference to the

11

allegedly fabricated interview, the Mr. Pollack's arrest and prosecution were supported by probable cause. *See Taylor*, 82 F.3d at 1562; *Romero*, 45 F.3d at 1476; *Stonecipher*, 759 F.3d at 1142; *Wilkins*, 528 F.3d at 805. This means that even were the interview fabricated, it was not the but-for cause of the challenged action. This claim must be dismissed.

## CONCLUSION

For the foregoing reasons, Detective Miller's motion for summary judgment (Doc. 98) is **GRANTED**. The Clerk shall enter judgment for Detective Miller and close this case.

Dated: June 9, 2020.     BY THE COURT:

_____
Daniel D. Domenico
United States District Judge